**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

ANTWYN GIBBS,                                )
                                             )
                    Plaintiff,               )
v.                                           )          **Civil Action No. 2:21-00392**
                                             )
WARDEN DONALD AMES, *et al.*,                )
                                             )
                    Defendants.              )

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending before the Court are the following: (1) Defendants Wooten, Moles, and Mitchell's Motion for Summary Judgment (Document No. 186), filed on February 8, 2024; and (2) Defendant Becky's Motion for Summary Judgment (Document No. 188), also filed on February 8, 2024. The Court notified Plaintiff pursuant to Roseboro v. Garrison, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to Defendants' Motions and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by the Defendants in moving to dismiss. (Document No. 190.) On March 25, 2024, Plaintiff filed his Response to Defendants Wooten, Moles, and Mitchell's Motion for Summary Judgment. (Document No. 197.) On April 3, 2024, Defendants Wooten, Moles, and Mitchell filed their Reply. (Document No. 198.) Having examined the record and considered the applicable law, the undersigned has concluded that Defendants' Motions (Document Nos. 186 and 188) should be granted.

**PROCEDURAL BACKGROUND**

On November 17, 2021, Plaintiff, acting *pro se*, filed his Amended Complaint seeking

relief for alleged violations of his constitutional rights pursuant to 42 U.S.C. § 1983.[1] (Document No. 31.) Plaintiff names the following as Defendants: (1) Donald Ames, Warden; (2) John Frame; (3) Josh Ward; (4) Ms. Becky, Mental Health Therapist; (5) Sgt. White; (6) Sgt. Bowers; (7) Sgt. Legg; (8) CO II Moles; (9) CO I Reedy;[2] (10) CO II Brown; (11) Brenda Ward, Programming; (12) Pam Givings; (13) Lt. Mitchell; (14) CO II Benitt; (15) Captain Clifford; (16) Wooten; (17) Brad; and (18) CO I McDowell. (Id.) First, Plaintiff alleges that Defendants Ames, Frame, and Ward are violating his constitutional rights by improperly "answering grievances for medical" and telling Plaintiff not to file anymore grievances. (Id., p. 4.) Plaintiff further contends that he "can't exhaust his grievances due to [Defendant] McDowell holding Plaintiff's legal mail by signing Plaintiff's signature." (Id., p. 6.) Plaintiff states that his constitutional rights are further violated because he files grievances and "never gets them back." (Id., p. 8.) Second, Plaintiff alleges Defendants Ames and Frame "train their officers to be untrained in lack of training by beating up Plaintiff" in violation of his Eighth Amendment right. (Id., p. 4.) Plaintiff contends that the correctional officers that beat him up are Sgt. Bowers, Lt. Mitchell, and CO II Moles. (Id., p. 5.) Plaintiff further alleges that CO Reedy and CO Brown sprayed Plaintiff "behind a cell door of Q2 pod 5 for complaining about his store call." (Id.) Plaintiff argues that inmates are not to be sprayed behind a cell door unless the inmate is a danger to himself or others. (Id.) Plaintiff alleges although he was "cuffed from behind and shackled," Sgt. White used force by dragging Plaintiff. (Id., p. 6.)

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). The undersigned specifically notified Plaintiff that his Amended Complaint would supersede any prior Complaints and Addendums, and there must be one integrated document that would provide the defendants with notice of the claims and allegations against them. (Document Nos. 11, 17, 30.) The Court granted multiple motions to amend filed by Plaintiff. (*Id.*)

[2] CO I Reedy was initially identified by Plaintiff as CO I Reid.

Third, Plaintiff complains that Defendant McDowell "gave Plaintiff's legal mail without signing off on the legal mail." (Id., p. 4.) Fourth, Plaintiff complains that his "child's mother" is keeping Plaintiff's child from him, and Defendant McDowell "is working with them to keep me in prison." (Id.) Fifth, Plaintiff alleges that Mr. Wooten takes items from Plaintiff's "store call," money, and TV without due process. (Id., p. 5.) Sixth, Plaintiff alleges that he is harassed and threated by MOCC staff, Donald Ames, and John Frame for filing grievances. (Id., p. 6.) Sixth, Plaintiff complains that he is being denied proper medical treatment for "a root that was cracked in his mouth" because Ms. Becky in "Mental Health" claims that Plaintiff has a mental problem. (Id.) Finally, Plaintiff appears to challenge the validity of his underlying criminal conviction. (Id., pp. 7 – 8.) Plaintiff alleges that the "Supreme Court" violated his constitutional rights by failing to allow Plaintiff to present an oral argument "about the cumulative error of the cell phone that was used in Plaintiff's trial" and the use of "illegal evidence that was used in Plaintiff's trial." (Id., p. 7.) Plaintiff claims that it was a violation of his "constitutional rights that he went to trial with his co-defendant, Kevin Goodman." (Id.) Plaintiff argues that his Sixth Amendment right to counsel was violated when he was "illegally extradited from South Carolina." (Id.) Plaintiff alleges that prosecutor withheld "exculpatory evidence of the government warrant to use against Plaintiff at a supplemental hearing." (Id.)

By Proposed Findings and Recommendation ("PF&R") entered on February 2, 2022, the undersigned recommended that the District Court "**DISMISS** Plaintiff's Amended Complaint (Document No. 31) as to his claim that (1) Defendants violated his constitutional rights by denying him access to the administrative remedy process; (2) Defendants violated his Eighth Amendment rights by verbally harassing and threating him; (3) Defendants violated his constitutional rights during the course of his State court criminal proceedings; (4) Defendants violated his First

Amendment rights concerning his legal mail; and (5) Plaintiff's complaint that his "child's mother" is keeping Plaintiff's child from him, and Defendant McDowell "is working with them to keep me in prison," **DENY** Plaintiff's "Motion for Injunctions" (Document No. 37), and **REFER** this matter back for further proceedings on Plaintiff's claim of that (1) Defendants Ames, Frame, [Bowers], Mitchell, Moles, [Reedy], Brown, and White subjected Plaintiff to excessive force in violation of the Eighth Amendment; (2) Defendant Mental Health Therapist Becky subjected Plaintiff to deliberate indifference in violation of the Eighth Amendment; and (3) Defendant [Wooten] denied Plaintiff due process regarding the taking of his personal property." (Document No. 39.) By Memorandum Opinion and Order entered on March 4, 2022, Judge Berger adopted the PF&R and referred the matter back to the undersigned for further proceedings. (Document No. 44.) On May 26, 2023, Defendant Mental Health Therapist Becky filed her Answer. (Document No. 106). On May 30, 2023, Defendant Ames filed a "Motion to Dismiss Plaintiff's Amended Complaint" and Memorandum in Support. (Document Nos. 107 and 108.) In support, Defendant Ames argues as follows: (1) "Plaintiff has plead no facts to succeed on a claim of excessive force against Defendant Ames" (Document No. 108, pp. 3 – 4.); (2) "Plaintiff cannot succeed on a § 1983 claim for failure to adequately train against Defendant Ames because Plaintiff has failed to plead sufficient facts to succeed on this claim" (Id., pp. 4 – 5.); (3) "Plaintiff also cannot succeed on a claim premised on vicarious liability" (Id., pp. 5 – 6.); and (4) "Defendant Ames is entitled to qualified immunity as Defendant Ames did not violate any clearly established right belonging to Plaintiff" (Id., pp. 6 – 7.). Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on May 31, 2023, advising him of the right to file a response to the Defendant Ames' Motion to Dismiss by June 30, 2023. (Document No. 109.)

On June 5, 2023, Defendant Wooten filed his Answer. (Document No. 113.) On June 6 and

4

7, 2023, Plaintiff filed his Objections to Defendant Mental Health Therapist Becky's Answer. (Document Nos. 118 and 120.) On June 27, 2023, Defendant Moles filed his Answer. (Document No. 132.) Also on June 27, 2023, Defendant Frame filed a Motion to Dismiss Amended Complaint and Memorandum in Support. (Document Nos. 133 and 134.) In support, Defendant Frame argues as follows: (1) "Plaintiff has plead no facts to succeed on a claim of excessive force against Defendant Frame" (Document No. 134, pp. 3 – 4.); (2) "Plaintiff cannot succeed on a § 1983 claim for failure to adequately train against Defendant Frame because Plaintiff has failed to plead sufficient facts to succeed on this claim" (Id., pp. 4 – 5.); (3) "Plaintiff also cannot succeed on a claim premised on vicarious liability" (Id., pp. 5 – 6.); and (4) "Defendant Frame is entitled to qualified immunity as Defendant Frame did not violate any clearly established right belonging to Plaintiff" (Id., pp. 6 – 7.). Notice pursuant to Roseboro was issued to Plaintiff on July 5, 2023, advising him of the right to file a response to the Defendant Frame's Motion to Dismiss by August 5, 2023. (Document No. 138.) On July 6, 2023, Defendant Mitchell filed his Answer. (Document No. 139.) On July 17, 2023, Plaintiff filed Additional Document in Support of his Complaint. (Document No. 145.) On July 21, 2023, Defendants Bowers and Brown filed their Answer. (Document No. 146.) On August 28, 2023, Defendant White filed his Answer. (Document No. 148.) On September 8, 2023, the undersigned entered a Scheduling Order setting forth the deadlines of the completion of discovery and the filing of dipositive motions. (Document No. 151.)

By PF&R entered on October 6, 2023, the undersigned recommended that the District Court "**GRANT** Defendant Ames "Motion to Dismiss Plaintiff's Amended Complaint" (Document No. 107) and Defendant Frame's "Motion to Dismiss Amended Complaint" (Document No. 133), and **REFER** the matter back to the undersigned for further proceedings concerning the remaining defendants." (Document No. 157.) On October 16, 2023, Plaintiff filed

5

Objections. (Document No. 158.) By Memorandum Opinion and Order entered on March 4, 2024, Judge Berger overruled Plaintiff's Objections, adopted the PF&R, and referred the matter back to the undersigned for further proceedings. (Document No. 185.)

On February 8, 2024, Defendants Wooten, Moles, and Mitchell filed their Motion for Summary Judgment and Memorandum in Support. (Document Nos. 186 and 187.) Defendants argue that they are entitled to the entry of summary judgment in their favor based on the following: (1) "The evidentiary record conclusively establishes that Defendants Moles and Mitchell were not involved in the alleged excessive force incident from which Plaintiff bases his 8th Amendment claim upon against these defendants" (Id., pp. 6 – 8); (2) "Plaintiff's Due Process claim against Defendant Wooten fails as a matter of law as there was simply no constitutional violation for allegedly depriving Plaintiff of a T.V." (Id., pp. 8 – 11); and (3) "Defendants are entitled to qualified immunity as there are no genuine issues of material fact that Defendants did not violate any clearly establish right belonging to Plaintiff" (Id., pp. 11 – 13).

As Exhibits, Defendants Wooten, Moles, and Mitchell attach the following: (1) The transcripts from Plaintiff's Deposition (Document No. 186-1); (2) A copy of the Summary Report prepared by Superintendent Ames to the Director of Security Steven Caudill dated August 11, 2021, regarding an incident involving Plaintiff on August 5, 2021 (Document No. 186-2, pp. 1 - 6); (3) A copy of an Incident Report against Plaintiff prepared by Defendant Mitchell dated August 5, 2021 (Incident Report 00383435) (Id., pp. 7 – 9); (4) A copy of an Incident Report against Plaintiff prepared by Officer John Bolen dated August 5, 2021 (Incident Report 00383434) (Id., pp. 10 – 11); (5) A copy of Incident Reports against Plaintiff prepared by Defendant Aaron Bowers dated August 5, 2021 (Incident Report 00383437, 00383438, 00383439) (Id., pp. 12 – 19); (6) A copy of an Incident Report against Plaintiff prepared by Officer Kevin Wright dated August 5,

2021 (Incident Report 00383442) (Id., pp. 20 – 21); (7) A copy of an Incident Report against Plaintiff prepared by Samuel Kelly dated August 5, 2021 (Incident Report 00383441) (Id., pp. 22 – 24); (8) A copy of an Incident Report concerning Plaintiff prepared by RN Autumn Blair dated August 5, 2021 (Incident Report 00383440) (Id., pp. 25 - 26); (9) The Affidavit of Charles Moles (Document No. 186-3); (10) The Affidavit of Andy Mitchell (Document No. 186-4); (11) A copy of Grievance No. 21-MOCC-Q2-1590 as submitted by Plaintiff on November 30, 2021 (Document No. 186-5); and (12) A copy of Grievance No. 21-MOCC-Q2-1601 as submitted by Plaintiff on December 1, 2021 (Document No. 186-6).

Also on February 8, 2024, Defendant Becky[3] filed her Motion for Summary Judgment and Memorandum in Support. (Document Nos. 188 and 189.) Defendant argues that she is entitled to the entry of summary judgment in her favor because there is no evidence of deliberate indifference. (Document No. 189, pp. 2 – 10.) First, Defendant Becky states that "Plaintiff has not provided any evidence of a 'serious medical need.'" (Id., pp. 3 – 4.) Second, Defendant Becky states that her actions do not "suggest deliberate indifference to Plaintiff's medical needs." (Id., pp. 5 – 9.) Finally, Defendant Becky argues that Plaintiff failed to exhaust his administrative remedies. (Id., pp. 9 -10.) As Exhibits, Defendant Becky attaches the following: (1) The transcripts from Plaintiff's Deposition (Document No. 188-1); (2) A copy of United States Magistrate Judge Cheryl A. Eifert's PF&R as entered in Gibbs v. Wexford Health Sources, Inc., Case No. 2:20-cv-00867 (Document No. 188-2); (3) A copy of United States District Judge Joesph R. Goodwin's Order adopting Judge Eifert's PF&R (Document No. 188-3); and (4) A copy of Plaintiff's grievances (Document No. 188-4).

---

[3] Defendant indicates that Plaintiff incorrectly named her as Mental Health Ms. Becky instead of Rebecca Bowman.

Notice pursuant to <u>Roseboro</u> was issued to Plaintiff on February 9, 2024, advising him of the right to file a response to Defendants' Motions for Summary Judgment. (Document No. 190.) Plaintiff filed his Response in Opposition to Defendants Wooten, Moles, and Mitchell's Motion for Summary Judgment on March 25, 2024. (Document No. 197.) Defendants Wooten, Moles, and Mitchell filed their Reply on April 3, 2024. (Document No. 198.)

## SUMMARY OF EVIDENCE

In his Deposition, Plaintiff testified concerning his claims against Defendants Mitchell, Bowers, Moles, Wooten, and Becky. (Document Nos. 186-1 and 188-1.) Concerning Defendants Moles, Mitchell, and Bowers, Plaintiff states that his claim involves an incident "in which they were bringing [him] in from the rec yard and [he] had [his] head slammed against the wall, punched in the eye, and [he] was called racial slurs." (Document No. 186-1, p. 5.) Plaintiff explains that he was in the "rec yard and it was cold outside and I wanted to go in." (<u>Id.</u>, p. 3.) Plaintiff states that he asked "one of the COs" if he could go inside, and the CO ignored him. (<u>Id.</u>) Plaintiff asserts that he thinks that the CO was Defendant Bowers. (<u>Id.</u>) Plaintiff acknowledges that he repeatedly asked the COs "Why can't I go in." (<u>Id.</u>) Plaintiff states that the COs responded "We'll take you in when we want to take you in." (<u>Id.</u>) In response, Plaintiff asserts that he asked for the COs to "go get a gold badge" and that was Defendant Mitchell. (<u>Id.</u>) Plaintiff acknowledges that he and the COs got "into a heated argument because they wouldn't get a gold badge for me." (<u>Id.</u>) Plaintiff explains that Defendant Bowers then removed Plaintiff from the cage to take Plaintiff back inside when Defendant Mitchell arrived and asked Plaintiff to calm down. (<u>Id.</u>) Plaintiff contends that when he was being escorted inside by the COs, Plaintiff kept trying to turn his head to talk to Defendant Mitchell and the escorting COs kept instructing Plaintiff to look forward. (<u>Id.</u>) Plaintiff explains that as he was "about to go in Q2 Pod 5, one of the officers, either [Bowers] or Moles, hit

8

my face against the window and then punched me in my eye." (Id., pp. 3 – 4.) Plaintiff contends

that after he got punched in the eye, Defendant Moles put him in a chokehold and took Plaintiff

into "the office where the nurse was coming." (Id.) Plaintiff states that Defendant Mitchell was

present at the time his face got hit against the window and he was punched in the eye. (Id., p. 4.)

Finally, Plaintiff states that he believes Defendant Bowers, Moles, and Mitchell used racial slurs

against him. (Id.)

Concerning Defendant Wooten, Plaintiff explains he is asserting a due process claim

regarding Defendant Wooten "withholding my TV." (Id.) Plaintiff states that he was "on the

program for three and a half years" and CO Wooten was told by "higher-ups to give me my TV

and he wouldn't give me my TV." (Id.) Plaintiff acknowledges that he got his TV in 2022. (Id., p.

5.)

Concerning Defendant Becky, Plaintiff states that his claim is for "deliberate indifference

to [his] medical needs, basically stating that [Plaintiff] had mental problems when [Plaintiff] was

going through pain with [his] tooth." (Document No. 188-1, pp. 14 – 15.) Specifically, Plaintiff

states that he "believe[s] medical and mental health talked with each other about [his] medical

issues, period." (Id., p. 15.) In support of the foregoing, Plaintiff explains as follows:

> Every time I asked to seek medical attention, mental health come. So I felt like
> when I put in a request to see medical, medical probably tells mental health to come
> and see me because I need mental health problems. And mental health would come
> and see me. Because they had asked me, 'Was you complaining about your tooth?'
> Maybe you need mental health, is basically what mental health was telling me, that
> I need mental health.

(Id.) Plaintiff states that he never felt like he had mental health problems and never requested

mental health, but he was offered mental health treatment. (Id., pp. 16 – 17.) Plaintiff explains that

he considered the offering of mental health treatment by Defendant Becky as "harassment." (Id.,

9

p. 17.)

On the same day of the incident, Defendant Mitchell prepared an "After Action" Incident

Report detailing the events that occurred on August 5, 2021 at approximately 1:20 p.m. (Document

No. 186-2, pp. 7 - 9.) Specifically, Defendant Mitchell described the incident as follows:

> On Thursday, 05 August 2021, I Lieutenant Andy Mitchell was performing my duties as Assistant Restricted Housing Supervisor when the following incident occurred. At approximately 0120 hours, I did enter the Q2 rec yard and Inmate Antwyn Gibbs OID # 3575372 was yelling that all the officers were racist and that he was demanding to go back to his cell. I then existed the rec yard assisting Cpl. Charles Moles in escorting Inmate Spradling, Zackeory OID # 3592295 back to his assigned cell. Upon returning to the rec yard Cpl. Aaron Bowers did advise me that Inmate Gibbs did refuse to come out of the rec cage. Inmate Gibbs did comply with orders to be placed in mechanical restraints and removed from the rec cage. Inmate Gibbs was displaying verbal non-compliance and demanding to be taken to his cell at this time stating that we are all racist and he was filing grievances on all of us. I did advise Inmate Gibbs that until his irate behavior stopped that he would not be placed back in his cell. I continued dialog with Inmate Gibbs for several minutes and he did finally calm down and comply to be taken to his cell. Cpl. Aaron Bowers and COI Samuel Kelly were escorting Inmate Gibbs back to his assigned cell which is 508 he was given several loud verbal commands to stop trying to pull away from the officers and turning his head. Inmate Gibbs did refuse and continued to show defensive resistance by pulling away from the officers and turning his head. Inmate Gibbs did refuse and continued to show defensive resistance by pulling away from the officers and attempting to turn towards them. At this time Cpl. Aaron Bowers did place Inmate Gibbs on the wall beside of the Pod 5 door to gain compliance. Inmate Gibbs did comply with orders and did become complaint he was then escorted to the multi-purpose room where COI Kevin Wright did begin recording with Canon Camera # 15112. Central Control was notified by Cpl. Dennis Cutlip and he did contact medical. RN Autumn Blair did enter the Unit and medically assessed Inmate Gibbs. Inmate Gibbs was then placed back in his cell 508 without further incident and I did complete a debriefing of the incident at this time. Approximately 5 minutes after being placed in his cell he did begin to kick his cell door to the point it was showing unsecure. I did order COI Kevin Wright to begin recording on Canon Camera # 15113 and upon arriving to cell 508 he stated that he wanted a grievance and I did ask him if that was the reason he was kicking his door. He stated that I was going to be in his grievance. At this time we did exit pod 5 without any further incident. Inmate Gibbs was placed on 72 hour lockdown and I did contact medical and ask about his double cuff order which did expire August 01, 2021.

(Id.)

10

On the same day of the incident, Sergeant John Bolen prepared a "Call Down" Incident Report detailing the events that occurred on August 5, 2021 at approximately 1:20 p.m. (Id., pp. 10 - 11.) Specifically, Sergeant Bolen described the incident as follows:

> On Thursday, 05 August 2021, I Sergeant John Bolen was working my assigned post in Central Control at the Mt. Olive Correctional Complex and Jail when the following incident did occur. At approximately 0120 hours I/M Gibbs, Antwyn OID#3575372 was being escorted back to his cell when I/M Gibbs began showing defensive resistance by trying to push and pull away from Cpl. Bowers and COI Kelly forcing them to place I/M Gibbs on the wall to gain compliance. Once compliance was gained I/M Gibbs was then escorted to the multi-purpose room to be medically assessed by Registered Nurse Autumn Blair. After medical assessment was completed I/M Gibbs was then placed back in his cell. A call down was completed and attached is this report.

(Id.)

On the same day of the incident, Defendant Bowers prepared three Incident Reports detailing the events that occurred on August 5, 2021 at approximately 1:20 p.m. (Id., pp. 12 - 19.) In his "Use of Force" Incident Report, Defendant Bowers described the incident as follows:

> On Thursday, 05 August 2021, at approximately 0120 hours, while performing my assigned duties, at Mt. Olive Correctional Complex and Jail, in Quilliams Two, I, Corporal Aaron C. Bowers did have the following incident occur while pulling the recreation group from the QII recreation yard. Inmate Gibbs, Antwyn OID #3575372 did become very agitated and started to verbally threaten Correctional Officer One Samuel Kelly and I, stating "I will get my people to fu*k you up." COI Kelly then attempted dialogue and asked him, what was the matter? I/M Gibbs then continued to verbally cuss at COI Kelly and I, stating "You all are some racist bitch ass whores." I then told I/M Gibbs it was time to come off the recreation yard. I/M Gibbs then refused to come off the yard. I then verbally directed I/M Gibbs to come over to the food try slot and comply with an unclothed body search, in which I/M Gibbs then complied. COI Kelly then applied wrist restraints to I/M Gibbs. Once out of the rec cage, COI Kelly then applied leg restraints. Lieutenant Andy Mitchell then started dialogue asking I/M Gibbs about what was going on. I/M Gibbs continued to get loud and demanded we take him back to his cell now. Lt. Mitchell told him to calm down and we will take him back to his cell. After some time, COI Kelly and I began to escort I/M Gibbs back to his cell. During the escort I/M Gibbs started trying to pull away from COI Kelly and I, showing defensive resistance. I then directed him to stop, continue looking forward and not to turn his head. I/M Gibbs continued his behavior and would not comply. I then placed I/M Gibbs on

11

the wall to gain control. COI Kelly then assisted in gaining control, helping escort him to the multi-purpose room. Once in the multi, we then placed I/M Gibbs in a grey plastic chair. Once in the chair, I then immediately took control of I/M Gibbs' head to prevent him from spitting or turning his head. Correctional Officer One Kevin Wright then began recording the incident. After I/M Gibbs calmed down, I then stopped controlling his head and placed my hand on his right shoulder. Registered Nurse Autumn Blair then entered the unit and began a medical assessment. After the medical assessment was complete I/M Gibbs was cleared to return to his cell. COI Keely and I then escorted him back to his cell with no further incident.

(Id., pp. 12 – 14.) In his first "Violation of Rules of Conduct" Incident Report, Defendant Bowers

described the incident as follows:

On Thursday, 05 August 2021, at approximately 0120 hours, while performing my assigned duties, at Mt. Olive Correctional Complex and Jail, in Quilliams Two, I, Corporal Aaron C. Bowers did have the following incident occur while pulling the recreation group from the QII recreation yard. Inmate Gibbs, Antwyn OID # 3575372 did become very agitated and started to verbally threaten Correctional Officer One Samuel Kelly and I, stating "I will get my people to fu*k you up." Due to I/M Gibbs' actions, I Cpl. Aaron C. Bowers am charging him in accordance to Policy Directive 325.00 Rule Number 2.02 – Threats.

(Id., pp. 15 – 16.) In his second "Violation of Rules of Conduct" Incident Report, Defendant

Bowers described the incident as follows:

On Thursday, 05 August 2021, at approximately 0120 hours, while performing my assigned duties, at Mt. Olive Correctional Complex and Jail, in Quilliams Two, I, Corporal Aaron C. Bowers did have the following incident occur while pulling the recreation group from the QII recreation yard. Inmate Gibbs, Antwyn OID # 3575372 did become very agitated and started to verbally threaten Correctional Officer One Samuel Kelly and I, stating "I will get my people to fu*k you up." COI Kelly then attempted dialogue and asked him, what was the matter? I/M Gibbs then continued to verbally cuss at COI Kelly and I, stating "You all are some racist bitch ass whores." I then told I/M Gibbs it was time to come off the recreation yard. I/M Gibbs then refused to come off the yard. I then verbally directed I/m Gibbs to come over to the food try slot and comply with an unclothed body search, in which I/M Gibbs then complied. COI Kelly then applied wrist restraints to I/M Gibbs. Once out of the rec cage, COI Kelly then applied leg restraints. Lieutenant Andy Mitchell then started dialogue asking I/M Gibbs about what was going on. I/M Gibbs continued to get loud and demanded we take him back to his cell now. Lt. Mitchell told him to calm down and we will take him back to his cell. After some time, COI Kelly and I began to escort I/M Gibbs back to his cell. During the escort I/M Gibbs

12

started trying to pull away from COI Kelly and I, showing defensive resistance. I then directed him to stop, continue looking forward and not to turn his head. I/M Gibbs continued his behavior and would not comply. Due to I/M Gibbs' actions, I Cpl. Aaron C. Bowers am charging him in accordance to Policy Directive 325.00 Rule Number 2.01 – Refusing an Order.

(Id., pp. 17 – 19.)

On the same day of the incident, Correctional Officer One Kevin Wright prepared a "Use of Force" Incident Report detailing the events that occurred on August 5, 2021 at approximately 1:20 p.m. (Id., pp. 20 - 21.) Specifically, COI Wright described the incident as follows:

On Thursday, 05 August 2021, at approximately 0120 hours, while performing my assigned duties, at Mt. Olive Correctional Complex and Jail, in Quilliams Two, I, Correctional Officer One Kevin Wright did have the following incident occur. At approximately 0120 hours, I did operate Camera Number 15113 to video Inmate Gibbs, Antwan OID #3575372 during the use of force until Lieutenant Andy Mitchell gave the debriefing. I then went back to doing my assigned duties with no further incident.

(Id.)

On the same day of the incident, Correctional Officer One Samuel Kelly prepared a "Use of Force" Incident Report detailing the events that occurred on August 5, 2021 at approximately 1:20 p.m. (Id., pp. 22 - 24.) Specifically, COI Kelly described the incident as follows:

On Thursday, 05 August 2021, at approximately 0120 hours, while performing my duties, at Mount Olive Correctional Complex and Jail, in Quilliams Two, I, Correctional Officer One Samuel Kelly did have the following incident occur while pulling the recreation group from the QII recreation yard. Inmate Gibbs, Antwyn OID # 3575372 did become very agitated and started to verbally threaten I COI Kelly and Corporal Aaron Bowers, stating "I will get my people to fu*k you up." I COI Kelly then attempted dialogue and asked him, what was the matter? I/M Gibbs then continued to verbally cuss at I COI Kelly and Cpl Aaron C. Bowers, stating "You all are some racist bitch ass whores." Cpl Aaron C. Bowers then told I/M Gibbs it was time to come off the recreation yard. I/M Gibbs then refused to come off the yard. Cpl Aaron C. Bowers then verbally directed I/m Gibbs to come over to the food try slot and comply with an unclothed body search, in which I/M Gibbs then complied. I COI Kelly then applied wrist restraints to I/M Gibbs. Once out of the rec cage, I then applied leg restraints. Lieutenant Andy Mitchell then started dialogue asking I/M Gibbs about what was going on. I/M Gibbs continued to get

13

loud and demanded we take him back to his cell now. Lt. Mitchell told him to calm down and we will take him back to his cell. After some time, Cpl Aaron C. Bowers and I began to escort I/M Gibbs back to his cell. During the escort I/M Gibbs started trying to pull away from Cpl Aaron C. Bowers and I, showing defensive resistance. Cpl Aaron C. Bowers then directed him to stop, continue looking forward and not to turn his head. I/M Gibbs continued his behavior and would not comply. Cpl Aaron C. Bowers then placed I/M Gibbs on the wall to gain control. I COI Kelly and Cpl Aaron Bowers took him into the multipurpose room. Once in the multi, we then placed I/M Gibbs in a grey plastic chair. Once in the chair, Cpl Aaron C. Bowers then immediately took control of I/M Gibbs' head to prevent him from spitting or turning his head. Correctional Officer One Kevin Wright then began recording the incident. After I/M Gibbs calmed down, Cpl Bowers then stopped controlling his head and placed my hand on his right shoulder. Registered Nurse Autumn Blair then entered the unit and began a medical assessment. After the medical assessment was complete I/M Gibbs was cleared to return to his cell. Cpl Bowers and I then escorted him back to his cell with no further incident.

(Id.)

On the same day of the incident, Registered Nurse Autumn Blair prepared a "Medical Assessment" Incident Report detailing the events that occurred on August 5, 2021 at approximately 1:20 p.m. (Id., pp. 25 - 26.) Specifically, RN Blair described the incident as follows:

On Thursday, 05 August 2021, while working my assigned duties in Medical Front of at Mount Olive Correctional Complex and Jail, I, Autumn Blair, Registered Nurse, did have the following incident occur. At approximately 0120, I was notified by DCR staff that Inmate Antwyn Gibbs OID # 3575372 was in need of medical assessment following a spontaneous use of force in Quilliams Two. Upon my arrival, Inmate Gibbs was sitting in a chair of the Quilliams Two multi-purpose room. I then performed a medical assessment on Inmate Gibbs, who was calm and cooperative. Due to my medical findings, I then cleared Inmate Gibbs to return to his assigned cell. At approximately 0140, I returned to my duties in Medical Front of MOCCJ without further incident.

(Id.)

On August 11, 2021, Superintendent Ames prepared a Memo Summary regarding the August 5, 2021 Incident wherein Superintendent Ames determined "[t]here was a need for the forced used," "Officers' efforts were applied as a good faith effort," and the "threat was reasonably perceived and acted upon my correctional staff." (Id., pp. 2 – 6.) Superintendent Ames summarized

the incident as follows:

> Force continuum was employed as Control Tactics were used due to Inmate
> Antwyn Gibbs OID #3575372 yelling that all the officers were racist and that he
> was demanding to go back to his cell from the Quilliams II recreation yard.
> Lieutenant Andy Mitchell then exited the recreation yard due to helping assist
> Corporal Charles Moles in escorting Inmate Spradling, Zackeory OID #3592295
> back to his assigned cell. Upon returning to the recreation yard Corporal Aaron
> Bowers advised that Inmate Gibbs did refuse to come out of the recreation cage.
> Lt. Mitchell began dialog and Inmate Gibbs did comply with orders to be placed in
> mechanical restraints and removed from the recreation cage. Inmate Gibbs was
> displaying verbal noncompliance and demanding to be taken to his cell at this time
> stating that we are all racist and he was filing grievances on all of us. Lt. Mitchell
> did advise Inmate Gibbs that until his irate behavior stopped that he would not be
> placed back in his cell.
>      Lt. Mitchell continued dialog with Inmate Gibbs for several minutes and he
> did finally calm down and comply to be taken to his cell. Cpl. Bowers and
> Correctional Officer I Samuel Kelly were escorting Inmate Gibbs back to his
> assigned cell #508 he was given several loud verbal commands to stop trying to
> pull away from the officers and turning his head. Inmate Gibbs did refuse and
> continued to show defensive resistance by pulling away from the officers and
> attempting to turn towards them. This forced Cpl. Bowers to place Inmate Gibbs
> on the wall beside of the Pod 5 door to gain compliance. Inmate Gibbs did comply
> with orders and did become compliant he was then escorted to the multipurpose
> room where Correctional Officer I Kevin Wright did begin recording with Canon
> Camera # 15112.

(Id., pp. 4 – 5.)

In his Affidavit, Defendant Moles acknowledges there was a use of force against Plaintiff

that Defendant Moles "was not present for, nor involved in." (Document No. 186-3.) Defendant

Moles states that the use of force incident "occurred with Plaintiff during which a use of force was

used on Plaintiff when escorting Plaintiff back to his cell from the Recreation Yard." (Id.)

Defendant Moles states that during the use of force incident involving Plaintiff, Defendant Moles

"was escorting Inmate Zackeory Spradling (OID # 3592295) back to his assigned cell." (Id.)

Defendant Moles states that he never used any force against Plaintiff and was not involved in any

use of force that Plaintiff claims. (Id.) Specifically, Defendant Moles states as follows: "I did not

slam Plaintiff, nor did I choke Plaintiff, nor did I punch Plaintiff while Plaintiff was being escorted back to his cell from the Recreation Yard on August 5, 2021." (Id.)

In his Affidavit, Defendant Mitchell acknowledges that there was a use of force against Plaintiff on August 5, 2021, while Plaintiff was being escorted back to his cell from the Recreation Yard. (Document No. 186-4.) Defendant Mitchell states that prior to the use of force, Plaintiff "was in the Recreation Yard yelling at officers demanding he return to his cell." (Id.) Defendant Mitchell explains that during this time, he "was assisting Correctional Officer Charles Moles with escorting inmate Zackeory Spradling back to his assigned cell." (Id.) Upon returning to the Recreation Yard, Defendant Mitchell states that Plaintiff "was displaying verbal noncompliance and demanding to be taken to his cell." (Id.) Defendant Mitchell then "dialogued with Plaintiff" and "he began to calm down and comply to be taken to his cell." (Id.) Defendant Mitchell states that Defendant Bowers and COI Samuel Kelly escorted Plaintiff back to his cell. (Id.) Defendant Mitchell states that he was not present during the escorting of Plaintiff back to his cell or involved in or present for the use of force against Plaintiff that occurred while escorting Plaintiff back to his cell. (Id.) Specifically, Defendant Mitchell states as follows: "I did not slam Plaintiff, nor did I choke Plaintiff, nor did I punch Plaintiff while Plaintiff was being escorted back to his cell from the Recreation Yard on August 5, 2021." (Id.) Defendant Mitchell states he was only involved in "debriefing the incident after the fact." (Id.)

In Grievance No. 21-MOCC-Q2-1590 dated November 30, 2021, Plaintiff complained that he was entitled to a TV pursuant to Policy 326.00. (Document No. 186-5.) In Response, the Unit Manager notified Plaintiff that he was a "Level One on the [Quality of Life ("QOL")] Program and not eligible for a TV." (Id.) Plaintiff appealed to the Superintendent on December 1, 2021, who affirmed the response of the Unit Manager. (Id.) Plaintiff then appealed to the Commissioner,

16

who affirmed the decision of the Superintendent and denied the grievance. (Id.)

In Grievance No. 21-MOCC-Q2-1601 dated December 1, 2021, Plaintiff inquired as to why he was still at Level One on the QOL program and complained that he was entitled to a TV and radio. (Document No. 186-6.) In Response, the Unit Manager notified Plaintiff that he was still at Level One on the QOL program because Plaintiff "refuses to comply with rules of QOL by not completing education packet." (Id.) Plaintiff appealed to the Superintendent on December 1, 2021, who affirmed the response of the Unit Manager noting that Plaintiff's "behavior is the reason." (Id.) Plaintiff then appealed to the Commissioner, who affirmed the decision of the Superintendent and denied the grievance. (Id.)

## **STANDARD**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-moving movant." Wai Man Tom v. Hospitality Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020)(citations omitted.); also see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(A "material fact" is a fact that could affect the outcome of the case); CTB, Inc. v. Hog Slat, Inc., 954 F.3d 647, 658 *4th Cir. 2020)("A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict of the nonmoving party."); FDIC v. Cashion, 720 F.3d 169, 180 (4th Cir. 2013)(A "genuine issue" of material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor). "The party seeking summary judgment shoulders the initial burden of

demonstrating to the court that there is no genuine issue of material fact." <u>Wai Man Tom</u>, 980 F.3d at 1037. The moving party may satisfy this burden by showing that the non-moving party has failed to prove an essential element of the non-moving party's case that the non-moving party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim.). Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 325, 106 S.Ct. 2548; <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986); <u>also see</u> <u>Wai Man Tom</u>, 980 F.3d at 1037(citation omitted)("[T]o survive the motion for summary judgment, [the non-moving party] may not rest on the allegations averred in his pleadings. Rather, the nonmoving party must demonstrate specific, material facts exist that give rise to a genuine issue.") Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. <u>Anderson</u>, 477 U.S. at 247-48, 106 S.Ct. 2505("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); <u>Perry v. Kappos</u>, 2012 WL 2130908, * 3 (4th Cir. 2012)(quoting <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985)("At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action.") All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. <u>Matsushita</u>, 475 U.S. at 587, 106 S.Ct. at 1356; <u>also see</u> <u>Sedar v. Reston Town Center</u>

18

Property, LLC, 988 F.3d 756, 763 (4th Cir. 2021)("The requirement to construe the facts, and all reasonable inferences therefrom, in the light most favorable to the non-moving party does not require [the court] to accept cherry-picked snippets of the testimony divorced from their context."). Additionally, the court is not allowed to make credibility determinations or weigh the evidence at the summary judgment stage. Stanton v. Elliott, 25 F.4th 227, 234 (4th Cir. 2022)(noting that the disbelief in a non-moving party's ability to succeed on the merits is insufficient to grant summary judgment). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate. See Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993)(Summary judgment is proper where it is apparent from the record that "no reasonable jury could find for the nonmoving party.")

## ANALYSIS

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Title 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." Thus, Section 1983 provides a "broad remedy for violations of federally protected civil rights." Monell v. Dep't of Social Services, 436 U.S. 658, 685, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Generally speaking, to state and prevail upon a claim under 42 U.S.C. § 1983, a Plaintiff must prove that (1) a person acting under color of State law (2) committed an act which deprived him of an alleged right, privilege or immunity protected by the Constitution or laws of the United States.

1.    **Defendants Mitchell and Moles:**

In his Amended Complaint, Plaintiff alleges that Defendants Bowers, Mitchell, and Moles subjected him to excessive force. (Document No. 31, p. 5.) In support, Plaintiff contends that

19

Defendants Bowers, Mitchell, and Moles "beat him up." (Id.)

In their Motion for Summary Judgment, Defendants Mitchell and Moles argue that Plaintiff's claim of excessive force against them should be dismissed. (Document No. 186 and Document No. 187, pp. 6 – 8.) Defendants Mitchell and Moles argue that "[t]he evidentiary record conclusively establishes that Defendants Moles and Mitchell were not involved in the alleged excessive force incident from which Plaintiff bases his 8th Amendment claim upon against these defendants." (Id., p. 6.) In support, Defendants Mitchell and Moles contend that "[t]he evidentiary record establishes that neither of these two individuals were involved in the alleged excessive force that Plaintiff asserts a claim upon." (Id., p. 7.) Defendants Mitchell and Moles argue that outside of Plaintiff's own self-serving testimony, there is no evidence supporting a claim against them. (Id.) Defendants Mitchell and Moles assert "this is insufficient as a matter of law to create a genuine issue of material fact which would preclude summary judgment." (Id., pp. 7 – 8.) Defendants argues that "the affidavit of Defendant Moles, the affidavit of Defendant Mitchell, the Use of Force review, and all the corresponding incident reports make clear that neither Defendant Moles nor Mitchell exercised the use of force Plaintiff states occurred." (Id., p. 8.) Therefore, Defendants Mitchell and Moles argue they are entitled to summary judgment. (Id.)

In Response, Plaintiff argues that "material cited in Defendants' Motion does not establish their absence but does establish their presence during the excessive/spontaneous force used against the plaintiff because Defendant Mitchell entered the Quilliams II recreation yard and witnessed Plaintiff yelling at the officers and demanding to go back to his cell." (Document No. 197, pp. 1 – 2.) Plaintiff acknowledges that Defendant Mitchell exited the recreation yard for a moment to assist Defendant Moles to escort another inmate back to his assigned cell. (Id., p. 2.) Plaintiff states that upon returning to the recreation yard, Defendant Mitchell "began dialog and Plaintiff complied

20

with orders to be placed in mechanical restraints and removed from the recreation cage." (Id.) Plaintiff acknowledges that he was "displaying verbal (not physical) noncompliance and demanded to be taken to his cell by calling the officers racist and stating that he was going to file grievances against all of the officers involved in the incident." (Id.) Plaintiff further acknowledges that "Defendant Mitchell then advise the plaintiff that until his irate behavior stopped that he would not be placed back in his cell" and "Defendant Mitchell continued dialog with Plaintiff for several minutes and he finally calmed down enough and was taken back to his cell." (Id.) Plaintiff states that based on his "personal knowledge and belief, it was Defendants Bowers, Mitchell, Moles and COI Kelly that escorted him to his cell. (Id.) Plaintiff contends that he "simply turned his head around in an effort to speak with officers on the way back to his cell" and "this angered Defendant Bowers because he smashed the plaintiff's head against the wall beside the Quilliams II Pod 5 door and other officers punched the plaintiff in the eye and tried to choke him out." (Id., pp. 3 – 4.) Plaintiff states that he then became compliant and he was escorted to the multi-purpose room. (Id.)

In Reply, Defendants Mitchell and Moles note that "Plaintiff's Response recites his own version of the evidence and regurgitates his prior testimony already addressed in Defendants' Motion for Summary Judgment." (Document Nos. 198, p. 3.) Defendants assert that "[t]he affidavit of Defendant Moles, the affidavit of Defendant Mitchell, the Use of Force review, and all the corresponding incident reports make clear that neither Defendant Moles nor Mitchell exercised the use of force Plaintiff states occurred." (Id.) Defendants Mitchell and Moles argue that "Plaintiff fails to refute this evidence and further fails to raise any factual questions regarding said evidence." (Id.) Defendants Mitchell and Moles contend "because there are no genuine issues of material fact with respect to the actions, or more fittingly, the lack of involvement, of Defendants Moles and Mitchell, summary judgment in their favor is appropriate." (Id.)

21

As a general matter, punishments prohibited under the Eighth Amendment include those which "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In the context of prison officials' use of force upon an inmate, the appropriate inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 320-21, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986)(citations omitted); also see Wilkins v. Gaddy, 559 U.S. 34, 130 S.Ct. 1175, 178, 175 L.Ed.2d 995 (2010). To establish a violation of the Eighth Amendment in the context of a challenge to prison officials' use of force, an inmate must allege (1) that the prison officials acted with a "sufficiently culpable state of mind" under a subjective standard and (2) a "sufficiently serious" injury under an objective standard. Wilson v. Seiter, 501 U.S. 294, 297-99, 111 S.Ct. 2321, 2323-25, 115 L.Ed.2d 271 (1991); also see Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008).

To establish the subjective component, an inmate must demonstrate that prison officials applied force "maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21, 106 S.Ct. at 1085. In determining whether prison officials acted maliciously and sadistically, the following factors must be balanced: (1) "the need for application of force," (2) "the relationship between that need and the amount of force used," (3) "the threat reasonably

perceived by the responsible officials," and (4) "any efforts made to temper the severity of a forceful response." Iko, 535 F.3d at 239(citing Whitley, 475 U.S. at 321, 106 S.Ct. at 1078). Additionally, the absence of serious injury is relevant to the determination of prison officials' culpable intent, but is not dispositive. Id. Although every "malevolent touch" by a prison guard will not give rise to a federal cause of action, "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." See Wilkins, 559 U.S. at 38, 130 S.Ct. at 1179; Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992).

Concerning the objective component, the focus is "not on the severity of any injuries inflicted, but rather on 'the nature of the force,' which must be 'nontrivial.'" Wilkins, 559 U.S. at 40, 130 S.Ct. at 1179("The 'core judicial inquiry' . . . [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"); also see Hill v. Crum, 727 F.3d 312, 321 (4th Cir. 2013)("[T]he nature of the force, rather than the extent of the injury, is the relevant inquiry.") The "absence of serious injury," however, is not irrelevant to the inquiry. Id., 559 U.S. at 37, 130 S.Ct. at 1178(citing Hudson, 503 U.S. at 9, 112 S.Ct. at 995). The extent of an inmate's injury may (1) "suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation," and (2) "provide some indication of the amount of force applied." Id.(citations omitted). 'The Eighth Amendment's prohibition . . . necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of the sort repugnant to the conscience of mankind." Harris v. Salley, 339 Fed.Appx. 281, 284 (4th Cir. 2009), citing Hudson, 503 U.S. at 9 - 10, 112 S.Ct. at 1000. "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive

force claim." <u>Wilkins</u>, 559 U.S. at 38, 130 S.Ct. at 1178(citations omitted). The objective component standard, however, is significantly less demanding than required in the context of challenges to conditions of confinement because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." <u>Hudson</u>, 503 U.S. at 9, 112 S.Ct. at 1000 ("This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.") Thus, the objective component is "responsive to contemporary standards of decency." <u>Id.</u>

The undersigned will consider Plaintiff's claim that Defendants Mitchell and Moles subjected Plaintiff to excessive force. In his Amended Complaint, Plaintiff supports such a claim by stating that Defendants Mitchell and Moles "beat him up." As discussed above in the "Summary of Evidence," there is no evidence of Defendants Mitchell and Moles using force against Plaintiff other than Plaintiff's self-serving statement that Defendant Moles placed him in a chokehold. <u>See</u> <u>Anderson</u>, 477 U.S. at 247-48, 106 S.Ct. 2505("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); <u>Perry v. Kappos</u>, 2012 WL 2130908, * 3 (4th Cir. 2012)(quoting <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985)("At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action.") A review of Summary Report prepared by Superintendent Ames and Incident Reports prepared by the officers involved in the incident reveals that neither Defendant Mitchell nor Defendant Moles were involved in the use of force against Plaintiff. (Document No. 186-2.) The description of the events surrounding the incident as set forth in the Incident Reports are collaborated by Affidavits. (Document Nos. 186-2, 186-3, and

24

186-4.) When describing the alleged use of excessive force incident during his Deposition, Plaintiff initially indicated he was unaware of which officer allegedly "choked" him. (Document No. 186-1, p. 3.) Specifically, Plaintiff stated as follows: "After I got punched in the eye, one of the officers choked me and took me into the office where the nurse was coming." (Id.) Although Plaintiff later stated in the Deposition that it was Defendant Moles "that had [him] in a chokehold," Plaintiff further stated that he could not see what was happening after he was placed in the chokehold. (Id., p. 4.) Plaintiff acknowledged that he did not know who allegedly punched him in the eye. (Id.) As thoroughly described in the "Summary of Evidence," the Summary Report, Incident Reports, and Affidavits confirm that neither Defendant Moles nor Defendant Mitchell were involved in the use of force against Plaintiff. Specifically, the evidence reveals that Defendant Moles was escorting another inmate to his cell when Plaintiff was yelling at the officers for being racists and making demands to be returned to his cell. Defendant Mitchell began a dialog with Plaintiff advising Plaintiff he would not be escorted to his cell until his irate behavior stopped. After several minutes, Plaintiff calmed down and Defendant Bowers and COI Kelly began escorting Plaintiff to his cell. The evidence indicates that Defendant Bowers used forced to place Plaintiff on the wall due to Plaintiff's continuous refusal to stop trying to pull away and turning his head. Viewing the evidence most favorable to Plaintiff, the undersigned finds no evidence that Defendants Mitchell or Moles used excessive force against Plaintiff during the escorting of Plaintiff from the recreation yard back to his cell. Besides Plaintiff's self-serving statement, there is no indication that either Defendant Mitchell or Defendant Moles participated in the escorting of Plaintiff to his cell or used any kind of force against Plaintiff. Plaintiff's self-serving declaration contrary to the objective evidence is not sufficient to preclude summary judgment. See Harris v. Home Sales Co., 499 Fed.Appx. 285, 294 (4th Cir. 2012)("Although we do not make credibility determinations at the summary

25

judgment phase, we should also not find a genuine dispute of material fact based solely on [plaintiff's] self-serving testimony.") Even where the non-moving party in such a situation is a *pro se* prisoner entitled to liberal construction of his pleadings, a "declaration under oath ... is not enough to defeat a motion for summary judgment. He has to provide a basis for his statement. To hold otherwise would render motions for summary judgment a nullity." Campbell–El v. Dist. of Columbia, 874 F.Supp. 403, 406–07 (D.C.1994); also see Evans v. Technologies Applications & Service, Co., 80 F.3d 954, 692 (4th Cir. 1996)(Summary judgment affidavits cannot be conclusory or based on hearsay); Moore v. United States, 1987 WL 11280 (S.D.W.Va. March 23, 1987)(Unsupported affidavits setting forth "ultimate or conclusory facts and conclusions of law" are insufficient to either support or defeat a motion for summary judgment.); Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002)(citing Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir.2001))(Courts are not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."). The record clearly reveals that Defendant Bowers placed Plaintiff on the wall in efforts to control Plaintiff's aggressive behavior and his failure to comply with orders to look forward. Even assuming Defendant Moles was present and placed Plaintiff in a chokehold during this time, there is no indication that a quantity of force greater than necessary was used against Plaintiff by Defendant Moles. See Iko, 535 F.3d at 240(citation omitted)(It is a violation of the Eighth Amendment for prison officials to force greater than necessary or for the sole purpose of infliction of pain.) Plaintiff does not allege that Defendant Moles continued to use force or a chokehold after Plaintiff became complaint. The record is completely void of any indication that Defendants Mitchell or Moles applied force "maliciously and sadistically for the very purpose of causing harm." Accordingly, the undersigned respectfully recommends that the District Court grant Defendants' Motion for Summary Judgment as to Plaintiff's excessive force claim against

26

Defendants Mitchell and Moles.

**2.    <u>Defendant Wooten</u>:**

In his Amended Complaint, Plaintiff appears to allege that Defendant Wooten denied Plaintiff due process regarding the taking of his personal property. (Document No. 31, p. 5.) In support, Plaintiff alleges that Mr. Wooten takes items from Plaintiff's "store call," money, and TV without due process. (<u>Id.</u>, p. 5.) In his Deposition, Plaintiff clarifies he is asserting a due process claim regarding Defendant Wooten "withholding my TV." (Document No. 186-1, p. 5.) Plaintiff states that he was "on the program for three and a half years" and CO Wooten was told by "higher-ups to give me my TV and he wouldn't give me my TV." (<u>Id.</u>) Plaintiff acknowledges that he got his TV in 2022. (<u>Id.</u>)

In his Motion for Summary Judgment, Defendant Wooten argues that Plaintiff's due process claim "fails as a matter of law as there was simply no constitutional violation for allegedly depriving Plaintiff of a TV." (Document No. 186 and Document No. 187, pp. 8 - 11.) Defendant Wooten claims that Plaintiff has failed to state a colorable due process claim because "it is abundantly clear that Plaintiff was not entitled to receive a TV due to his level on the QOL program at MOCC." (Document No. 187, p. 10.) Defendant Wooten states that "Plaintiff only alleges the deprivation of a TV and no other more serious conditions of confinement." (<u>Id.</u>) Defendant Wooten asserts "this is simply not enough as a matter of law to constitute a valid due process claim." (<u>Id.</u>) Defendant Wooten further argues that "even under Plaintiff's framing that Defendant Wooten arbitrarily denied Plaintiff a TV that he should have received under prison policy, such an action would not constitute a constitutional violation as the denial of a TV would be nothing more than a simply violation of prison policy." (<u>Id.</u>, p. 11.) Defendant Wooten notes that "it has long been settled that violation of departmental policy does not equate to violation of a clearly established

27

constitutional right." (Id.) Therefore, Defendant Wooten argues that Plaintiff as failed to state a due process claim." (Id.)

In Response, Plaintiff argues that "Defendant Wooten's position is simply weak because he merely relies on two grievances that were filed by the plaintiff and nothing more." (Document No. 197, p. 3.) Plaintiff, therefore, states he "cannot present facts essential to justify his opposition to Defendant Wooten's position without more information or facts." (Id., pp. 3 – 4.) Plaintiff concludes that Defendant Wooten must "provide more evidence to support his position for dismissal from the Complaint." (Id., p. 4.)

In Reply, Defendant Wooten continues to argue that he is entitled to summary judgment because "there are no genuine issues of material fact precluding summary judgment, as well as the fact that Plaintiff has no colorable due process claim against Defendant Wooten." (Document No. 198, pp. 3 – 4.) Defendant Wooten notes that "Plaintiff admits that he cannot 'present facts essential to justify his opposition to Defendant Wooten's position without more information or facts.'" (Id., p. 3.) Defendant Wooten asserts that instead of coming forth with evidence from the record, Plaintiff improperly asks this Court to order Defendant Wooten to provide more evidence. (Id.) Defendant Wooten argues that he has "already submitted evidence to refute Plaintiff's claims." (Id.)

Although the Fourteenth Amendment of the United States Constitution prohibits a State from depriving "any person of life, liberty, or property, without due process of law," the range of protected liberty interests for defendants convicted and confined in prison are significantly reduced for the period of incarceration. See U.S. Const. amend. XIV, § 1; Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991). The fact of conviction and imprisonment implies the defendant's transfer of his liberty to prison officials, who in their broad discretion, administer his sentence. Gaston, 946

28

F.2d at 343. Nevertheless, "confinement to prison does not strip a prisoner of *all* liberty interests." Id. (emphasis added) To determine whether an inmate retains a certain liberty interest, the Court must look to the nature of the claimed interest and determine whether the Due Process Clause applies. See Board of Regents v. Roth, 408 U.S. 564, 570-71, 92 S.Ct. 2701, 2705-06, 33 L.Ed.2d 548 (1972). An inmate holds a protectable right in those interests to which he has a legitimate claim of entitlement. Greenholtz v. Inmates of Nebraska Penal and Corr. Complex, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979)(quoting Roth, 408 U.S. at 577, 92 S.Ct. 2709). In Gaston, the Fourth Circuit determined that an inmate possesses a claim of entitlement in those interests "which were not taken away expressly or by implication, in the original sentence to confinement." Id. at 343. The Supreme Court held in Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), that in order to show the deprivation of a liberty interest protected by the Due Process Clause, an inmate must show either that: (1) the conditions of his detention exceeded the sentence imposed in such an unexpected manner as to give rise to protection by the Due Process Clause or (2) the confinement creates an atypical or significant hardship in relation to the ordinary incidents of prison life. Id., 515 U.S. at 484, 115 S.Ct. at 2300 (citations omitted). Absent allegations indicating that there has been a restraint upon the inmate's freedom which imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," the inmate's claims have no merit. Id.

Applying the principles set forth in Sandin, the undersigned initially finds that Plaintiff's placement in the QOL Program is neither a condition which exceeded his original sentence in an unexpected manner nor creates an atypical or significant hardship in relation to the ordinary incidents of prison life. There is no allegation or indication that Plaintiff's confinement in the QOL Program exceeded his original sentence of incarceration in such an unexpected manner as to give

rise to a due process violation or that such created an atypical or significant hardship. In his Deposition, Plaintiff confirms that his due process claim is based upon Defendant Wooten "withholding my TV." (Document No. 186-1, p. 5.) Thus, the undersigned considers whether Plaintiff has established a protected liberty interest concerning the "withholding" of his TV. "Without a protected liberty or property interest, there can be no federal procedural due process claim." Experimental Holding, Inc. v. Farris, 503 F.3d 514, 519 (6th Cir. 2007)(citing Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 579, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)); also see Wilkinson v. Austin, 545 U.S. 209, 221, 125 S.Ct. 2384, 2393, 162 L.Ed.2d 174 (2005)("We need reach the question of what process is due only if the inmate establishes a constitutionally protected liberty interest"). The undersigned notes there is no indication that Plaintiff had a TV in his possession that was physically taken by Defendant Wooten. Plaintiff merely appears to allege that he had a liberty interest in receiving a TV because he had been "on the program for three and a half years" and the "higher ups" directed Defendant Wooten to provide Plaintiff with a TV as an incitive for his participation in the QOL Program. Although Plaintiff indicates that he believes Defendant Wooten arbitrarily withheld a TV from Plaintiff, the evidentiary record does not support such a finding. In Grievance No. 21-MOCC-Q2-1590 filed on November 30, 2021, Plaintiff requested a TV but was notified that he could not receive a TV because he was only a Level One in the QOL Program. (Document No. 186-5.) In a subsequent grievance filed on December 1, 2021 (Grievance No. 21-MOCC-Q2-1601), Plaintiff inquired as to why he was not progressing in the QOL Program thereby making him eligible to receive a TV. (Document No. 186-6.) Plaintiff was notified that he was not progressing due to his behavior and failing to comply with the QOL rules by not completing his educational packet. (Id.) Therefore, the record is void of any evidence that Plaintiff was eligible to receive a TV pursuant to the QOL Program or that such was arbitrarily

30

withheld by Defendant Wooten. Even assuming Plaintiff did qualify for a TV pursuant MOCC policy, such is insufficient to state a claim. Prison staff's failure to follow their own policies or procedures, standing alone, does not amount to a constitutional violation. [4] <u>Riccio v. County of Fairfax</u>, 907 F.2d 1459, 1469 (4th Cir. 1990)(If the state law grants more procedural rights than the Constitution requires, a State's failure to abide by that law is not a federal due process issue); <u>Donohue v. Diggs</u>, 2011 WL 795889, * 3 (W.D.Va. March 1, 2011)("[A] state's failure to abide by its own procedural regulations is not a federal due process issue and is, therefore, not actionable under § 1983."); <u>Petway v. Lappin</u>, 2008 WL 629998 (N.D.W.Va. Mar. 5, 2008)(finding that plaintiff's "due process complaints concerning either the misapplication of policy and procedures, or a lack of official rules and regulations, must fail" because the inmate had no protected liberty interest in avoiding segregated confinement"); <u>also see</u> <u>Wilkinson v. Austin</u>, 545 U.S. 209, 221, 125 S.Ct. 2384, 2393, 162 L.Ed.2d 174 (2005)("We need reach the question of what process is due only if the inmate establishes a constitutionally protected liberty interest").

To the extent Plaintiff argues he was entitled to a certain classification within the QOL Program,[5] such is insufficient to establish a claim. The Due Process Clause does not give an inmate

---

[4] Even where a state statute or policy may create a liberty interest, the denial of such an interest must "impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" for the liberty interest to warrant the protection of the Due Process Clause. *See Prieto v. Clarke*, 780 F.3d 245, 249 (4th Cir. 2015)(citing *Sandin*, 515 U.S. 481-82, 115 S.Ct. 2293). In the instant case, there is no allegation or indication of atypical and significant hardship. *See Freeland v. Ballard*, 2011 WL 7394619, * 3 (S.D.W.Va. Aug. 18, 2011)(finding plaintiff's complaints regarding the conditions of his confinement in the QOL program did not establish an atypical and significant hardship for purposes of creating a liberty interest protected by due process).

[5] The QOL program is a "behavior driven progressive incentive system consisting of five levels that encourages appropriate behavior through behavior modification and programs participation and/or compliance." Specifically, the QOL program "is a five (5) level stratified program that rewards prisoners administratively segregated with increasing privileges for successful completion and good behavior." *Douty v. Ballard*, 2015 WL 1246615, * 7 (S.D.W.Va. March 18, 2015). The QOL program also "provides disincentive to inmates who continue to violate the rules by requiring inmates to repeat all or portions of the program after rules violations, non-compliance or poor behavior." *Id.* Finally, "[o]ne aspect of the [QOL] program is educational programming administered by the Department of Education" where "inmates are provided with education material that contain chapters on specific topics." *Id.* "If an inmate does not

31

a liberty interest in a certain prison classification. See Hewitt v. Helms, 459 U.S. 460, 477 n. 9, 103 S.Ct. 864, 874 n. 9, 74 L.Ed.2d 675 (1983)(stating that the "transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence"); Slezak v. Evatt, 21 F.3d 590, 594 (4th Cir. 1994), citing Montanye v. Haymes, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976)(the federal Constitution "vests no liberty interest in inmates in retaining or receiving any particular security or custody status as long as challenged conditions or degree of confinement is within sentence imposed and is not otherwise violative of Constitution"); Altizer v. Paderick, 569 F.2d 812 (4th Cir. 1978)(holding that federal due process constraints are not implicated because the classification of a State prison inmate is a matter of State prison officials' discretion); and Meachum v. Farno, 427 U.S. 215, 225 (1976)(stating that the transfer of an inmate to a higher security facility does not violate a liberty interest); Freeland v. Ballard, 2011 WL 7394619, * 3 (S.D.W.Va. Aug. 18, 2011)("The plaintiff has no right to notice and an opportunity to be heard prior to his assignment to a particular level of the QOL program, as a prisoner has no liberty interest in being housed in any particular prison facility.").

Finally, the denial of privileges are matters clearly contemplated by Plaintiff's original sentence. See Gaston, 946 F.2d at 343 (To safely and efficiently run the prison, prison officials maintain broad discretion over an inmate's "location, variations of daily routines, changes in conditions of confinement (including administrative segregation), and the denial of privileges"); Hatch v. District of Columbia, 184 F.3d. 846, 855 (D.C. Cir. 1999)(stating that "the transfer of an inmate to less amenable and more restrictive quarter for nonpunitive reasons is well within the

---

complete the worksheets, or provides answers that are not responsive to the subject, the inmate may be deemed non-compliant." *Id.*

terms of confinement ordinarily contemplated by a prison sentence"); and <u>Gholson v. Murry</u>, 953 F. Supp. 709, 716 (E.D.Va. 1997)(finding that the denial of work opportunities and certain education programs did not impose an atypical and significant hardship on inmates placed in segregation in relation to the ordinary incidents of prison life). It is well established that an inmate has no absolute right to prison privileges. <u>See Kentucky Department of Corrections v. Thompson</u>, 490 U.S. 454, 109, S.Ct. 1904, 104 L.Ed.2d 506 (1989)("The denial of prison access to a particular visitor is well within the terms of confinement ordinarily contemplated by a prison sentence and therefore is not independently protected by the Due Process Clause."); <u>Smith v. Roper</u>, 12 Fed.Appx. 393, 396 (7th Cir. 2001), <u>cert. denied</u>, 534 U.S. 1093, 122 S.Ct. 839, 151 L.Ed.2d 718 (2002)("In light of *Sandin*, the deprivations that Smith suffered as a result of the disciplinary proceedings - namely, 22 days in segregation, a six-month loss of privileges associated with his demotion to C class, and six days without phone privileges - do not implicate a liberty interest."); <u>Freitas v. Ault</u>, 109 F.3d 1335, 1337-38 (8th Cir. 1997)(finding that an involuntary transfer to a higher-security facility and loss of work and phone privileges did not constitute atypical and significant hardship); <u>Alkebulanyahh v. Ozmint</u>, 2009 WL 2043912, *9 (D.S.C. July 13, 2009), <u>aff'd</u>, 358 Fed.Appx. 431 (4th Cir. 2009)("[P]rison visitation does not implicate the standard set forth in <u>Sandin</u>."); <u>Principio v. McGinnis</u>, 2007 WL 2344872, * 2 (W.D.N.Y. Aug. 15, 2007)(finding that "60 days of keeplock with loss of telephone, packages, recreation and conjugal visits," was not an atypical or significant hardship); <u>Richardson v. Johnson</u>, 2001 WL 360843, * 1 n. 1 (N.D.Tex. April 5, 2001)(finding that phone-privilege restrictions, like commissary and recreation restrictions, do not impose a significant or atypical hardship on the inmate in relation to the ordinary incidents of prison life); <u>James v. Odom</u>, 2000 WL 1136563 *5 (S.D.Ala. May 30, 2000)(finding a 45-day restriction on inmate's "store, phone, and visiting privileges" did not

33

constituted an atypical or significant hardship); Ozolina v. Durant, 1996 WL 82481, * 1 (E.D.Pa. Feb. 26, 1996)(Under Sandin, "there is no right to visitation protected by the Due Process Clause."); and White v. Keller, 438 F.Supp. 110, 114 (D.C.Md. 1997), aff'd, 588 F.2d 913 (4th Cir. 1978)("[T]here is no constitutional right to prison visitation, either for prisoners or visitors"). Accordingly, the undersigned respectfully recommends that the District Court grant Defendants' Motion for Summary Judgment (Document No. 186) as to the foregoing claim.

Based upon the foregoing, the undersigned finds it unnecessary to consider the other reasons which Defendants Mitchell, Moles, and Wooten have submitted for dismissal.

**3.    Defendant Becky:**

In his Amended Complaint, Plaintiff alleges that Defendant Becky violated his Eighth Amendment rights. (Document No. 31, p. 6.) Specifically, Plaintiff complains that he was being denied proper medical treatment for "a root that was cracked in his mouth" because Defendant Becky in "Mental Health" claims that Plaintiff has a mental problem. (Id.)

In her Motion for Summary Judgment, Defendant Becky claims that Plaintiff cannot establish deliberate indifference to a serious medical need. (Document Nos. 188 and 189.) First, Defendant Becky states that Plaintiff has failed to establish a serious medical need. (Id., pp. 3 – 4.) Defendant Becky explains that Plaintiff stated during his Deposition that he began experiencing headaches and lightheadedness after a tooth extraction in 2020. (Id., p. 4.) Plaintiff stated that he continued to have these problems for a year after his surgery and was eventually advised he was experiencing nerve degeneration. (Id.) Plaintiff acknowledged that he was treated with Tylenol. (Id.) Second, Defendant Becky states that there is no allegation or indication that she was deliberately indifferent to any mental health condition suffered by Plaintiff. (Id., p. 5.) Defendant Becky notes it is undisputed that she is a mental health worker and not a medical provider. (Id.)

34

Defendant Becky argues that Plaintiff claims she disregarded his medical/dental needs. (Id.) Defendant Becky states that there is no evidence that she was "qualified or authorized to recognize, evaluate or treat medical or dental conditions of inmates." (Id.) Defendant Becky explains that Plaintiff "objects to her visits because she was from mental health, not medical." (Id.) Defendant Becky notes that Plaintiff's claim arises from the fact that "a week after [Plaintiff] made a sick call regarding his tooth, [Defendant Becky] visited him and asked about his mental health." (Id.) Defendant Becky further explains that Plaintiff's claim regarding deliberate indifference to his medical and dental needs were addressed and ultimately dismissed in Gibbs v. Wexford Health Sources, Inc., Case No. 2:20-cv-00867. (Id., pp. 7 – 9.) Defendant Becky concludes that "[i]t defies logic to suggest that the individuals who provided Plaintiff's medical and dental care were not deliberately indifferent regarding such care, but a mental health provider who visited Plaintiff at the request of medical personnel was deliberately indifferent as to such treatment." (Id., p. 9.) Accordingly, Defendant Becky argues that she is entitled to summary judgment. (Id.) Plaintiff did not file a Response to Defendant Becky's above Motion.

Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). See also Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that the Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'")(quoting Hudson v. Palmer, 468 U.S. 517, 526 - 27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only

those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). Sentenced prisoners are therefore constitutionally guaranteed adequate medical care under the Eighth Amendment.

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege and prove (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In *Strickler*, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") A medical need serious enough to give rise to an Eighth Amendment claim involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. Id.; also see Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 *1st Cir. 1990)("A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or that is so obvious that even a lay person would easily recognize the necessity for a doctor's

36

attention."); <u>Morales Felicciano v. Calderson Serra</u>, 300 F.Supp.2d 321, 341 (D.P.R. 2004)("A constitutional violation is . . . established when government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medication attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort, or a threat to good health.") The Fourth Circuit stated the applicable standard in <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 - 852 (4th Cir. 1990), as follows:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. * * * Deliberate indifference may be demonstrated by either actual intent or reckless disregard. * * * A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. * * * Nevertheless, mere negligence or malpractice does not violate the eighth amendment. (Citations omitted)

<u>Miltier v. Born</u>, 896 F.2d 848, 851 - 52 (4th Cir. 1990)(*recognized in* <u>Sharpe v. South Carolina Dept. of Corr.</u>, 621 Fed.Appx. 732, 733 (4th Cir. 2015) *as overruled in part on other grounds by* <u>Farmer</u>, 511 U.S. at 837, 114 S.Ct. 1970); <u>See also</u> <u>Sosebee v. Murphy</u>, 797 F.2d 179, 183 (4th Cir. 1986)(Facts indicating that guards were aware that inmate's condition had worsened and was life-threatening and intentionally ignored the situation and refused to seek medical assistance provided a reasonable basis for finding deliberate indifference to inmate's medical needs.); <u>Loe v. Armistead</u>, 582 F.2d 1291 (4th Cir. 1978), <u>cert. denied</u>, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980)(Pretrial detainee's allegations of delay in treatment of his broken arm indicated a reasonable basis for inferring deliberate indifference to his serious medical needs.); <u>Russell v. Sheffer</u>, 528 F.2d 318 (4th Cir. 1975)(Summary judgment for defendants affirmed where claim that inmate received constitutionally inadequate medical treatment involved a question of medical

37

judgment not subject to judicial review.) Therefore, Plaintiff must first allege and eventually establish a "sufficiently serious" deprivation of adequate medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon his Eighth Amendment claim. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. See Farmer, *supra*, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, *supra*, 511 U.S. at 837, 114 S.Ct. at 1979. Plaintiff in this case must therefore allege and establish that each Defendant was aware that he was receiving constitutionally inadequate medical care and disregarded the serious physical consequences.

Liberally construing Plaintiff's Amended Complaint, Plaintiff alleges that Defendant Becky acted with deliberate indifference by offering him mental health treatment when Plaintiff had only made complaints of tooth pain. For purposes of an Eighth Amendment claim, a medical need is serious if it involves a condition which places an inmate at substantial risk of serious harm, a condition for which lack of treatment causes continuous severe pain or significantly affects an individual's daily life activities, or a condition diagnosed as mandating treatment or obviously requiring medical attention. In her Motion, Defendant Becky argues that Plaintiff fails to allege a serious medical need. Defendant Becky acknowledges that during his Deposition, Plaintiff states that he experienced headaches and lightheadedness after his tooth extraction in 2020. Since Plaintiff indicates that he was suffering continuous pain after his tooth extraction, the undersigned will assume solely for purposes of this motion that Plaintiff's condition was serious enough to give

38

rise to an Eighth Amendment claim.

Next, the undersigned will consider whether Defendant Becky acted with deliberate indifference to Plaintiff's health and safety under a subjective standard. To satisfy the subjective component, Plaintiff must allege each Defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. Plaintiff contends that Defendant Becky acted with deliberate indifference by offering him mental health treatment when Plaintiff had only complained of tooth pain. It is undisputed that Defendant Becky is a mental health provider, who does not provide any medical or dental treatment. During his Deposition, Plaintiff states that his claim is for "deliberate indifference to [his] medical needs, basically stating that [Plaintiff] had mental problems when [Plaintiff] was going through pain with [his] tooth." (Document No. 188-1, pp. 14 – 15.) Specifically, Plaintiff states that he "believe[s] medical and mental health talked with each other about [his] medical issues, period." (Id., p. 15.) In support of the foregoing, Plaintiff explains as follows:

> Every time I asked to seek medical attention, mental health come. So I felt like when I put in a request to see medical, medical probably tells mental health to come and see me because I need mental health problems. And mental health would come and see me. Because they had asked me, 'Was you complaining about your tooth?' Maybe you need mental health, is basically what mental health was telling me, that I need mental health.

(Id.) Plaintiff states that he never felt like he had mental health problems and never requested mental health, but he was offered mental health treatment. (Id., pp. 16 – 17.) Plaintiff explains that he considered the offering of mental health treatment by Defendant Becky as "harassment." (Id.) Based upon the foregoing, the Court finds that Defendant Becky did not act with deliberate indifference concerning Plaintiff's medical, dental, or mental health needs.[6] Although Plaintiff

---

[6] To the extent Plaintiff is attempting to assert a claim regarding inappropriate medical or dental care regarding his tooth, such was addressed in a prior civil action. *Gibbs v. Wexford Health Sources, Inc.*, 2021 WL 5986995

concludes that Defendant Becky acted with deliberate indifference by offering mental health treatment, the undisputed record does not support such a conclusion. The undisputed evidence reveals that Defendant Becky was not a medical or dental provider and as a mental health provider, Defendant Becky merely offered mental health treatment to Plaintiff. Although Plaintiff states that he does not have any mental health issues and complains that such treatment should not have been offered by Defendant Becky, the offering of such services does not constitute deliberate indifference. Specifically, there is no evidence that Defendant Becky knowingly disregarded Plaintiff's need for mental health treatment. At most, Plaintiff appears to simply disagree with the appropriate course of treatment or the offering of mental health treatment. An inmate's disagreement with his medical care or the course of treatment is insufficient to support a deliberate indifference claim, and questions of medical judgment are not subject to judicial review. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975). "[T]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." Malcomb v. Raja, 2010 WL 3812354, at * 1 - 2 (S.D.W.Va. Sept. 22, 2010)(quoting Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977)(finding that plaintiff was provided medication for his pain and "Defendants' decision to provide plaintiff with one medication over another does not give rise to a constitutional violation.") Based upon the undisputed facts, the undersigned finds that Defendant Becky did not act with deliberate indifference concerning Plaintiff's medical, dental, or mental health needs. Thus, the undersigned respectfully recommends that Defendant Becky's Motion for Summary Judgment (Document No. 188) be granted.

---

(S.D.W.Va. Sep. 14, 2021), *report and recommendation adopted*, 2021 WL 5451775 (S.D.W.Va. Nov. 22, 2021), *aff'd*, 2022 WL 604052 (4th Cir. 2022).

4.    **Defendant Reedy**:

The undersigned finds that Defendant Reedy should be dismissed due to the lack of service. Although officers of the Court are charged with *assisting* the Plaintiff with service of process under 28 U.S.C. § 1915(d) due to his *in forma pauperis* status, neither the Court nor the United States Marshals Service ("USMS"), are required to be *advocates* for the *pro se* Plaintiff. The Court has no responsibility to continue to search for the location of any unserved Defendant for the purpose of perfecting service of process for the Plaintiff. In Skaggs v. Clark, 2015 WL 269154 (S.D.W.Va. Jan. 21, 2015), United States District Judge Robert C. Chambers stated as follows:

> Notwithstanding the difficulties faced by an incarcerated plaintiff, it is not yet, and cannot become, the role of the courts to track down defendants on behalf of incarcerated plaintiffs. At a minimum, such plaintiffs bear the reasonable burden of identifying some address where service can be properly made. Only upon provision of such information – which is absent here – can the courts execute services.

Skaggs v. Clark, 2015 WL 269154, * 3 (S.D.W.Va. Jan. 21, 2015); also see Ray v. Pursell, 2017 WL 3707584 (S.D.W.Va. June 23, 2017)(same). The Court and the USMS have diligently attempted to effect service upon Defendant Reedy based upon the information provided by Plaintiff. Specifically, the Court has made several different attempts to obtain service upon Defendants Reedy based upon information provided by Plaintiff. (Document Nos. 40, 110, 111.) Each time, the information provided by Plaintiff was either incorrect or inadequate to effective service. (Document Nos. 92, 115, and 121.) By Order entered on June 7, 2023, the undersigned directed Plaintiff to provide an updated address for Defendant Reedy by July 10, 2023, after noting that the Summons for this defendant had been returned unexecuted by the USMS (Document No. 115). (Document No. 121.) The undersigned further notified Plaintiff of the following:

> Failure of Plaintiff to provide the Court with an updated address for Defendants Bouts and Reedy by **July 10, 2023**, will result in a recommendation of dismissal of this matter without prejudice as to Defendants Bouts and Reedy pursuant to Rule 41(b) of the Federal Rules of Civil Procedure and Rule 41.1 of the Local Rules of

41

Civil Procedure for the Southern District of West Virginia.

(Id.) Plaintiff failed to provide the Court with any further identifying information or an address for service of process concerning Defendant Reedy. If a defendant or his authorize representative is not served, Plaintiff cannot prevail on his claim against that person. It is Plaintiff's responsibility, and not the duty of the Court, to ascertain the identities and addresses of those individuals whom Plaintiff believes caused him injury. Accordingly, the undersigned respectfully recommends that Plaintiff's claims against Defendant Reedy be dismissed without prejudice due to the lack of service.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District Court **GRANT** Defendants Wooten, Moles, and Mitchell's Motion for Summary Judgment (Document No. 186), **GRANT** Defendant Becky's Motion for Summary Judgment (Document No. 188), and **DISMISS** Defendant Reedy without prejudice due to the lack of service.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Irene C. Berger. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo*

42

review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.

<u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Berger and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: April 18, 2024.



Omar J. Aboulhosn
United States Magistrate Judge